LOVELL–McCONNELL MFG. CO. v. AUTOMOBILE SUPPLY MFG. CO. et al.

(District Court, E. D. New York. January 6, 1914.)

1. PATENTS (§ 101*)—VALIDITY—INCLUDING METHOD CLAIMS IN MECHANICAL PATENT.

If a mechanical device produces a result by a method which is patentable, a method claim may be included with claims for the mechanical device in a patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 141; Dec. Dig. § 101.*]

‌4. PATENTS (§ 64*)—ANTICIPATION—PRIOR PATENT.

Mere possibility of a suggestion in a patent for further discovery or invention, not covered by any claim, is not anticipation.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 79; Dec. Dig. § 64.*]

3. PATENTS (§ 101*)—VALIDITY—CLAIMS FOR EQUIVALENT PARTS OF SAME STRUCTURE.

Claims of a patent, which cover different, but equivalent or exchangeable, parts of one patentable device, if each of such parts is patentable of itself, are not necessarily void, nor does their inclusion in the same patent render it invalid.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 141; Dec. Dig. § 101.*]

4. PATENTS (§ 54*)—PRIOR PUBLIC USE—ABANDONED EXPERIMENT.

Mere experimentation in public, or in a public place, followed by no improvement upon the prior art, and ultimately abandoned, is not sufficient to defeat a subsequent invention, upon which a patent has issued, and which has proved to be of commercial value, even though the experiments might have progressed to the point of disclosing the patented invention, but in fact did not.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 73; Dec. Dig. § 54.*]

5. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—AUTOMOBILE HORN.

The Hutchison patents, Nos. 923,048, 923,049, and 923,122, all relating to signaling or alarm horns for use on automobiles, launches, fire engines, etc., were not anticipated, and disclose patentable invention; also *held* infringed.

In Equity. Suit by the Lovell-McConnell Manufacturing Company (formerly the Lovell-McConnell Manufacturing Company, the Hutchison Electric Horn Company, and Miller Reese Hutchison) against the Automobile Supply Manufacturing Company and Louis Rubes, its president. On final hearing. Decree for complainant.

See, also, 193 Fed. 658.

George C. Dean, of New York City (Drury W. Cooper, of New York City, of counsel), for complainant.

Ralph L. Scott, of New York City (Frederick P. Fish, of Boston, Mass., and C. A. L. Massie, of New York City, of counsel), for defendants.

CHATFIELD, District Judge. The complainant in the present action alleges infringement by the defendants of three patents issued to

Miller Reese Hutchison, numbered 923,048, 923,049, and 923,122, all under date of May 25, 1909.

The answer presents the issue of noninfringement, invalidity of generic claims, both as to the devices of the patentee (when viewed as a complete structure, and also as to many separate features embodied in respectively separate claims), nonpatentability by reason of alleged anticipations, and nonpatentability from alleged lack of originality over the prior art, or of invention in the applications and devices set forth in the specifications and drawings and described in the claims. The defendants insist that the broad claims must be limited to what they assume might be patentable invention as improvements or definite combinations, but that they cannot be interpreted by the comprehensive meaning of the language alone, and, if the claims are so limited, the defendants' devices are alleged not to infringe.

The early difficulties of the case and various issues presented upon the application for a preliminary injunction (which was denied, without considering the merits of the patent in any way, in 193 Fed. 658) have been eliminated, either by intermediate orders of the court, by agreement of the parties, or by the testimony presented upon final hearing, which has rendered these matters of minor importance.

The complainant company held the patents by assignment. The complainant Hutchison, as patentee, appeared to be nevertheless entitled to join in the equity action; but the division of damages, if recovered, or of benefits under an injunction, if obtained, would have been reserved for decree and accounting. This is now immaterial.

The individual defendant appears by the record to have been properly joined as participant in the acts alleged to be infringements, and his objection to being included as an individual defendant, for the purpose of meeting the expenses of the action and satisfying an award of damages, will not be determined as a part of the questions of validity and infringement, but will also be left for final decree. His connection with the acts charged is such that there would seem to be no reason for separating him from the defendant company, in considering the merits of the charge of infringement.

A question of unfair competition, through the similarity of the devices put upon the market by the complainant and defendants, in their general appearance, size, contour of case and horn, general adaptability to be applied in the same way for exactly the same purpose, and the striking similarities of labeling and external appearance, indicate merely that the two articles are put forward by two different manufacturers, to supply exactly the same demand, to be substantially interchangeable in purpose or use, and render competition possible only by advertising any differences in price. The tone emitted by the complainant's device and that of the defendants cannot be told one from the other, unless the horns be sounded in a way to furnish almost simultaneous comparison, or when tested by an experienced ear.

The complainant's device was first upon the market, and the defendants' device is plainly, in the general ways described, a copy. Certain patterns of the defendants' device appear to have been sold before

212 F.—13

certain modifications of the complainant's, and as to these the defendants insist that the complainant has copied their commercial article. But these questions do not control in the present case.

If the complainant is entitled to the patents as alleged, then the placing upon the market of an article resembling the patented article in appearance merely simplifies the question of infringement, and throws some light upon the allegations of practicability, commercial advantage, and use. But the very evidence showing that the defendants have sold their device at a cheaper rate, to do the work of the complainant's device and in competition with it, makes the question of unfair competition merely an element of evidence in the patent action. If the defendants have not the right to use the various elements comprised in their device, in the form and relation in' which the device is put upon the market, then its general resemblance to the complainant's device would involve the question of unfair competition inextricably with the question of infringement. If, on the other hand, the defendants do not infringe, or if the complainant has not the right to control the manufacture of the device in question, the methods of advertising and the rivalry shown by the testimony, together with the old or obvious right to use similar materials, such as brass casings or horns and enameled labels, are of so little importance that at final hearing the issues have been confined strictly to the questions involved in the actions upon the patents.

Numerous other difficulties as to the order and taking of proof, conduct of the parties before and during the trial, and objection as to matters of advertising, which were brought to the court's attention and disposed of, or which came up from time to time and have disposed of themselves by later developments, need not now be restated. The strong feeling manifested, however, between the parties to the action, must be taken into account in weighing the testimony, and brings us to the collateral matters of public use in advance of discussion of the patents themselves.

The complainant, as shown by the record, has, by great effort and evident business ability, taken advantage of the sudden increase in the use of the automobile and the great market furnished for automobile parts within the last few years. It is true, as urged by the defendants, that no large market could have existed if automobiles had not been largely used; but, assuming that the complainant was fortunate in having a device to put on the market at the right time, nevertheless, the extended use of the complainant's and defendants' horns, and the large proportion of use in comparison with other kinds of signal alarms or horns for automobiles, make it certain that the device which Hutchison tried to patent, as worked out in commercial form, has a large sale, and its value has been speedily and apparently generally recognized by the public.

No serious contention is made that the complainant has put upon the market a different device than that patented by Hutchison. On the other hand, the defendants have argued in the opposite direction, viz., that Hutchison's patents set forth a device, and his claims generally cover a signal alarm, which has been capable of the commer-

cial success given it by the complainant, but which was much broader in many ways than any invention or claim to which the defendants admit Hutchison was entitled, if he had anything patentable in his mind at the time of filing his application.

It appears, further, that after filing his first application Hutchison continued to develop at least the expression of whatever patentable novelty he had. His counsel progressed in their dealings with the Patent Office, both in the way of volume and discrimination or differentiation of the separate matters which ultimately were embodied in separate claims. When placed upon the market, a number of the ideas and claims of the Hutchison applications were never carried beyond the paper patent stage, and by methods of elimination from the extensive statement of equivalents or of possible uses defined in the Hutchison applications, the complainant, for the commercial device, gradually worked out one form or type, which is the only form now treated as having such large commercial value, and which is also shown in the device of the defendants.

It further appears that the complainant, by ordinary business methods, contracted for and now uses, as a part of its signal, a one-way electric motor, of a type available to any one, but having the necessary capacity and qualifications for the use which the complainant wished. In practice, this motor can be run upon six dry cells and with a current of about six volts, for the ordinary use of the complainant's larger signal; the defendants' signal and a later and smaller horn of complainant are generally so constituted and adjusted as to run normally with the use of four volts. These devices are planned for attachment to an automobile, so that the current can be supplied from the secondary starting battery of the automobile, and the smaller current requirements of the smaller devices are like matters of cost; they introduce the element of saving both in cost and maintenance, as a matter of commercial competition.

In the course of business, the defendants procured from a manufacturer who sold to the market generally a number of electric motors, which had been manufactured to meet the supposed future wants of the complainant, and while the defendants thereby did not infringe any specific claim of the patent, nevertheless they have by the use of those motors, and similar motors of the same sort, increased the physical resemblance and the structural similarity of their signals to those of the complainant, and thus simplified the question of infringement.

The testimony shows, what would accord with the experience of the ordinary observer, that a signal alarm has two primary purposes: (1) The presence of the signaling moving object is to be brought to the attention of some person or persons; and (2) the effect desired is to prevent accident or cause the avoidance of danger. Where the signal is intended for use by boats, vehicles, individuals, or other moving and movable objects, the relation of the two parties to the signal is apparent. In street traffic, as in water traffic, notice is to be attracted, and, when attracted, information as to the next movement of the signaling party and as to what should be done by the party signaled must be conveyed. In operating automobiles upon the streets,

the presence and movement of the automobile has to be signaled to the unobserving or unconscious pedestrian, automobilist, or driver, whose own movements will be affected by the nearness of the signaling object. Sometimes the approach or the presence of the signaling object at a distance should be indicated, and the mere difference in loudness, caused by the difference in distance, direction of sound, or interference by other noises or the wind, strongly affects the successful use of a signal that might give proper warning under perfect conditions.

The testimony refers to the use of rubber bulb horns, sirens, bells, and signals that may be used to attract attention, but as to which it is unnecessary to discuss apparent limitations. Automobiles, which it is recognized now furnish the greatest demand for an efficient and successful signal, in many cases carry the smaller signal and also one of the complainant's or defendants' so-called horns. The signal alarm emitted by the complainant's and defendants' horns must be referred to, and although it is impossible to set forth in words any definition which will convey the same impression as the sound itself, this sound is so well known that identification is all that is necessary.

Both the complainant's and defendants' devices, almost simultaneously with the closing of the electric circuit, attain a sound of the same tone, power, and attraction-compelling capacity as that maintained by the device while the circuit is kept closed. This sound can be heard at a great distance. Both parties advertise that the sound can be heard half a mile, a mile, or such distance as may be illustrative of the use under description. When further away, the tone of the alarm is more musical, but of sufficient volume and penetration to attract the notice, in spite of other noises and general air vibrations. As the signaling object approaches, or as the sound comes from a lesser distance, its harsher, less melodious, more unpleasant, and more compulsory qualities increase, until, when close at hand, the unpleasant and disturbing elements of the sound overwhelm any musical or tone-producing sensation to the hearer. The sound has the further quality of indicating the direction of its source. This seems to be not only assisted by the general use of a horn, but even without the presence of a horn, the air vibrations set in motion localize themselves easily upon the senses of human beings generally, and, as shown by the testimony and judged from practical experience, the device of both the complainant and the defendants causes little confusion as to the exact direction from which the sound is coming. Such confusion as frequently results in accident is rather doubt as to the direction in which the person warned shall proceed to avoid danger than doubt as to the place from which the danger is coming. These signals further, by the immediate completeness with which they furnish the signal sound, as soon as the connecting part is pressed, have a tendency to control physical movement on the part of the person signaled, so quickly and so abruptly as to give greater protection than would be furnished by a more musical, pleasant, or gradual obtrusion upon the sensory faculties of the person to be warned.

The testimony indicates some discussion as to whether the element

of sudden fright increases or diminishes the danger from an approaching automobile; but this has nothing to do with the sufficiency of the signal of the complainant's and defendants' horns, in comparison with other signals, and does not enter into the present case.

Certain forms of the devices are made for operation by hand, that is, by turning of a crank instead of by the use of an electric motor; and, as will be seen when the specifications and claims are discussed, the automobile signal alarm makes no use of a number of actuating means stated in the patent. Both the complainant and the defendants use a rotary cam. This one means would seem to be, at the present time, the only commercially valuable means for putting an automobile or similar horn upon the market, and the use of these means in an automobile horn is plainly the most valuable use to both the complainant and the defendants, and covers, so far as the issues in this case are concerned, any question that might arise from modified devices for other purposes.

The various matters concerning the understanding of the patentee at the time of filing his application, and as to the possibility of claiming invention by describing a process or method, as distinguished from the functions or description of operation of a given machine, must be borne in mind in considering the patents themselves; but further discussion can be reserved until the objections to the claims of the patents are being considered.

The general defense of noninfringement is interwoven with the claims of the defendants that they are using embodiments of certain patents of the prior art, or that the differences between the complainant's patents and the patents of the prior art are as to details and as to matters which also distinguish the complainant's devices from those of the defendants.

These defenses will be disposed of by the determination of the questions as to validity and scope of the patents. The only two matters involved in the defense of noninfringement, which need be taken up separately, are those connected with the form of cam employed and with the presence of a bar rigidly attached at one extremity to the rim inclosing the diaphragm of the defendants' horn, and at the other end directly and rigidly in contact with the so-called wear piece or block or anvil upon which the blow of the cams is delivered.

Experiment, as stated in the testimony, has shown that this bar can be substantially or totally cut away without changing the action of the defendants' device, and that it serves no purpose except to stiffen the diaphragm and to offer resistance to some part of the force applied by the cam. Whether or not the independent vibration of this bar (and any resultant tone therefrom) may have something to do with the slightly greater musical sound of the defendants' horn is of no effect upon the case. This bar has no bearing, unless it corresponds in function and purpose to the springing bar of what will later be called the Gieseler and Pierman patents, and is not a sufficient change to provide any basis for the defense of noninfringement, unless it compels classification of the defendants' device as a Gieseler or

Pierman embodiment, and these matters will be discussed in connection with those patents.

The defendants use a cam having the projecting or cam surfaces upon the face thereof, that is, the cam revolves in a plane substantially parallel to the initial position plane of the diaphragm; while in the earlier form of the complainant's device the cam surfaces were upon the edge or periphery of the cam, which stood in a plane at right angles to that of the diaphragm. The defendants also use an undulating or symmetrical series of projections in its commercial device, thus making the cam generally capable of revolution in either direction. But the use, also, of the one-way rotary motor takes away any difference that might be claimed because of this feature of the cam. The complainant's cams can also be run in the reverse direction; but the arrangement of the cam surface and the use of the one-way rotary motor make it unnecessary to use more than one direction of rotation, and advantage is taken thereof in shaping the cam surface. The patents, also, as will be shown later, actually provide for various forms of cam contacts, capable of rotation in both directions, because of being entirely symmetrical, and also with greater or less pitch and variation of slope. But the preferable form, as stated in the patent, and the one which the complainant actually uses, presents a slope of such shape that the cam will deliver a blow substantially in the line of direction in which the diaphragm is to be moved; that is, without lateral thrust and immediately allowing for uninterfered-with movement or elastic return of the diaphragm, until the next cam comes in contact upon its rising slope; that is, the receding or back slope of the particular cam projection must be of sufficient pitch to serve the purpose intended of allowing the diaphragm to vibrate in the way desired. This the defendants' cam surfaces also accomplish, and, if valid, the claims of the patent are broad enough to cover all forms shown in the defendants' devices.

In other respects, the commercial articles are alike in all matters at issue in this case, and we therefore can pass to the consideration of the patents themselves, and view them from the standpoint of the prior art.

The first patent, No. 923,048, was issued upon an application filed March 14, 1906, and states that the invention relates to signaling or alarm horns, particularly such as are used on automobiles, fire engines, launches, etc.:

"My object is to produce a device of this type capable of utilizing as much power and of producing as loud a sound as may be desired. Another object is to obviate the necessity for refinements of construction and adjustment usually found in devices of this class and also to insure reliable positive operation of the device, under all the exigencies of practical everyday use."

Nine drawings are shown. Of these, Figs. 1, 3, 4, 5, and 6 represent a diaphragm firmly connected with the end of a pitman or link, which at the other end is mounted upon a rotary drive member or eccentric. The power for this rotary drive member may be either frictional or positively supplied by separate motor.

In Fig. 3, the pitman, although firmly connected with the diaphragm,

is divided into two parts, and a slot, instead of a round hole, is furnished for the pin connecting the two parts, thus allowing freedom of motion at right angles to the plane of the diaphragm and in the direction of the longitudinal dimension of the pitman.

Fig. 9 shows a rotary cam with two cam projections, with an anvil or wear piece firmly affixed to the center of the diaphragm, and of such form or shape that the resultant motion produced by the push of the cam is at a right angle to the surface of the diaphragm. In practical commercial use, the principles applied in the loose link coupling of the pitman, in this right angle thrust against the wear piece of the diaphragm by the cam projection, and in then giving space for elastic return of the diaphragm, are the elements taken from this patent, and with which we have to do in this suit.

The inventor says that he prefers to employ a horn, or resonant amplifier, and also a case around the pitman or rotary driving part; but he also says that neither the resonant amplifier nor the case is necessary. He says that the diaphragm may be actuated by any mechanical connection, although he prefers the loose link form of pitman. As a source of power he prefers a rotary motor; but this is to be used in connection with a pitman or reciprocating mechanism, and is not specifically mentioned as carrying the cam disk upon the armature shaft.

It may be assumed, however, that it would be no invention to employ a rotary motor to actuate a cam, after the disclosure of Hutchison's specifications, or in view of other patents such as Byng, No. 14,-642, of 1896 (British). In fact, Hutchison inserted in this original application claims subsequently carried into the third patent, and covering the use of a rotary motor, inclosed in a case and driving a cam disk, with projections like those of Fig. 9 of this first patent, but only in combination with other parts.

The application was divided in the Patent Office and a part refiled on October 14, 1908. Upon this letters patent No. 923,122 were issued, upon the 25th day of May, 1909, and are generally referred to as the third patent in this suit. The specifications in general follow those of patent 1, saying that a case may or may not be necessary. Preferably a resonator or horn may be provided, and an electric motor, in connection with the resonator diaphragm and case, is arranged so that the periphery of the rotary driving member has "a plurality of cam surfaces contacting with the wear piece or thrust member on the diaphragm." The cam is based upon the disclosure of Fig. 9 of the first patent. This cam is mounted directly upon the armature shaft of the small rotary motor. The case is made water and dust tight. The cam face is designed to furnish the resultant force in a direction perpendicular to the diaphragm surface, and the patentee states that the cam is preferably of low pitch on the advancing side. (It will be noticed that no limitation is stated in this connection as to the form of the cam beyond the crest.) The thrust member or wear piece on the diaphragm is preferably relatively low, and this diaphragm is preferably placed close to the closure or cap around the rear end of the horn and at the front of the case.

The specifications state that the operating voltage for the motor may be low, although powerful sounds may be produced, and that little current will be consumed, so that storage batteries or a small generator driven by the engine may be used to furnish power.

This patent describes the form of diaphragm preferred by the inventor, substantially equal in size and diameter to the front of the case, and held by suitable washers clamped between the end of the case and the closing cap around the horn. A diaphragm of relatively great diameter, stiffness, and amplitude of vibration, preferably mounted for vibration on both sides of normal, and, for example, when 6 inches in diameter, having an amplitude of vibration from $^1/_{32}$ to $^8/_{32}$ of an inch, is indicated as a properly working embodiment of the invention. The material of the diaphragm in this patent is said to be selected for the purpose of securing elastic and acoustic properties, without reference to electro-magnetic properties, and may be made of soft iron, spring steel, wood, etc. The projections upon the periphery of the cam disk are cut away beyond the high point or crest, so as to allow as much *space* for the elastic return of the diaphragm as is needed and to use the same amount of time as was allowed for the advancing thrust. In other words, the depression behind each cam, and the advancing slope of each cam, occupy substantially equal parts of each revolution or circumference, and the cam is in this respect symmetrical, allowing the diaphragm at least as much time for return as is allowed for the blows from the cam. The cam projections are of equal height, and by the use of an electric motor a wide range of speed can be secured. The testimony shows that speeds as high as 30,000 cam contacts a minute have been measured and compared in the commercial device of the complainant, and the tone available for the purposes of alarm begins at 8,000 or less; the only difference caused by increased speed of revolution being a jump from one tone to a higher harmonic (or to a higher harmonized frequency) when the speed increase is sufficient to force vibration at the rate required to produce the higher note.

The rotary motor is said to be particularly adapted for the purpose indicated, because the shunt winding of the field compels revolution in the desired direction without regard to the direction of the current supplied to the motor. The shape and relative arrangement of the cam surfaces, as between the driving surface on the cam wheel and the driven surface upon the diaphragm, can be varied considerably, if the result be a positive thrust in a direction vertical to the diaphragm.

This patent also states that:

"When in full operation, the spring of the diaphragm is partly forced and partly free, and the note produced is of a frequency equal to the revolutions per second multiplied by the number of cam projections."

The patentee states that the number of cam projections and their distance apart will be best determined (that is, are to be preferably arranged) so that when driven at the desired speed (that is, the speed planned for use) the cam surfaces will permit the elastic return of the diaphragm through a desired distance, before the next cam projection causes an outward movement. It is evident that this desired distance

is a distance which will bring the diaphragm back of its normal plane and produce actual displacement of the air in front of the diaphragm, which is necessary for the production of sound. The patentee says that the rates and frequencies of movements forced on the diaphragm may be independent of the frequency of free vibration of the diaphragm; that is, that the forcible displacement of the diaphragm need not be at the same rate at which the diaphragm would vibrate as a whole or in sections, if struck with a single blow. But the patentee says that great resonant effect, with small expenditure of power, will be attained when the forced displacement of the diaphragm and its natural vibrations to and fro under the impact of these blows adjust themselves so as to correspond. He suggests that this be done by multiplying the number of cams and correspondingly increasing the periphery of the disk, so as to maintain the relative spacing of the cam projections. And he states that the rate of positive outward displacement of the diaphragm is necessarily limited by the time required for the elasticity of the diaphragm to bring it back within the range of the cam projection. If the cam contacts occur more frequently than the natural period of elastic vibration, the cam contact will interfere with the full swing of the vibration and shorten its amplitude. Hence the patentee says that the outward forced movements of the cams are to be preferably harmonious with the times and velocities of the elastic return movements, although sufficient space or pitch of the surface back of the cam projection may allow the elastic return to be more rapid than the outward movement, if the forcing side of the cam be of less pitch. The patentee further says that, with the partly forced and partly free movements above described, the use of a horn resonator, having a pronounced natural frequency, will cause the natural vibratory movements of the diaphragm to harmonize with the natural frequencies of the horn. With an electric motor drive by which the speed varies in proportion to the work done, the *"device"* will tend to act in synchronism or harmony with one of *"its own natural frequencies"*; that is, the note produced will tend to remain as caused by the vibration at a rate of natural frequency for the *entire* instrument, until the power increases to such an extent as to overcome the load or work, and to cause a vibration at the rate of the next natural frequency.

To return for a moment to the first patent in suit, we find that the patentee has stated many more possible forms and arrangements of parts available for the pitman or eccentric connections, and even describes the blow delivered to the diaphragm as "a tapping impact," or a "positive forced vibration," or a "partly forced and partly free elastic vibration." With the tight connection, he states that the crank throw and the amplitude of the vibration are equal; with the link or loose pitman connection, some lost motion is possible, thus allowing of some vibration of the diaphragm inside of the limits furnished by the extremities of the link as the shaft of the pitman is pushed either forward or back. The patentee also says that, with the tight rod connection, some angular flexure of the diaphragm will be caused, and this will have to be considered in connection with some of the prior art patents, and will be referred to later.

In other respects, the disclosures of the drawings and specifications of the first patent are either similar to those in the third patent or vary from them only in the differences caused by the use of the rotary electric motor described in the third patent.

We need therefore repeat the language of this first patent no further, except to specify the claims sued on and to refer to these and the other claims of the patent when viewing the prior art. These claims of patent No. 923,048 are as follows: Nos. 16, 17, 19, 24, 27, 29, 36, 37. It seems unnecessary to repeat them in this opinion, as reference to the letters patent is necessary in any event.

The second patent in suit, No. 923,049, dated May 25, 1909, was issued upon an application filed May 16, 1907. This patent has to do with the vibrations of the diaphragm and the application of the cam surfaces thereto, as indicated in the first patent, and as applied in the third patent. The patentee states that great carrying power and loud sound are obtained by great amplitude of vibration with high frequency (greater velocity of vibration). Increased amplitude, with a decrease of velocity (such as increased amplitude through the use of a heavier diaphragm, thus diminishing the velocity, unless the power and speed be increased), will produce a low, ineffectual note for the purpose of alarm. The patentee therefore indicates that the desired note for alarm purposes lies within certain definite limits of frequency of vibration, resulting from the size and proportion and shape of parts and the power used. He comments upon what has been referred to in describing the first patent, and states that, in order to get greater vibrations and higher velocity without destroying the diaphragm, he seeks to have the vibratory spring as much as possible or wholly in the direction normal to the surface of the diaphragm, and to avoid segmentary or high frequency vibrations of parts of the diaphragm, except as these are necessary incidents to any bodily displacement. He again in this patent describes the arrangement of the cam surfaces and the contact piece upon the diaphragm, and specifies that this contact piece should have a large enough base, and its surface should be so shaped that the resultant thrust of the force applied by the cam surface falls, when projected, within the base of the contact piece. He states that by making this base small, and bringing the resultant thrust as much as possible in the direction of a perpendicular to the diaphragm, he is able to avoid the necessity of using too large a diaphragm, or of being compelled to clamp the diaphragm so far from the center as to necessitate localized bends, which tend to break the diaphragm and to increase its weight to a point where satisfactory velocity is interfered with. He states that proper arrangement will enable the device to cause a positive displacement out of normal by each cam projection, thus causing an acoustic wave or impulse of great amplitude, and that these acoustic waves may be made sufficient in number to give a note available for use as an alarm signal. But he recognizes that the rate of displacement may not be the same as the elastic return. He thus applies force to move the diaphragm as a whole, while "the production of high frequency vibration and noise" is merely incidental. He states that in

prior wheel-operated alarms the power is applied to strike the higher frequencies.

"Neither the ,directions nor times of its application bear any definite relation to bodily movement, and, if there is any bodily movement, it is wholly incidental and insignificant."

He describes in this patent and shows in the drawings a cam having more than two projecting cam surfaces, and having these cam surfaces of substantially symmetrical slope on each side of the high point. He shows in Figs. 2 and 15 the contact or wear piece of the diaphragm when in normal position, substantially at the bottom or low point of one of the recesses between the cam projections. He has indicated a general arrangement of parts capable of allowing attachment of the signal to either side of the automobile, and he has again illustrated a method of actuating the device by contact with a rapidly revolving member of the automobile, or by means of an electric motor. He specifies the arrangement of the anvil or contact piece upon the diaphragm, so as to make the vibratory stress take effect in the direction of the greatest strength of the fibre of the diaphragm. He provides for adjustment of the axis of the rotary cam so as to save unnecessary expenditure of power, and to secure a sufficient normal displacement of the diaphragm without causing a. destructive strain by the repeated blows of the cams. He provides for the use of lubricating parts and drainage holes in the case. He specifies diminution of weight or load, by reduction in the size of the contact piece, or by bending up part of the diaphragm for this purpose. He then states in his specifications two paragraphs which will need consideration in connection with the prior art. These are not made use of in the commercial form of horn, but do throw light upon the patentee's ideas of the phenomena produced and the means used to produce the same (letters patent No. 923,049, page 5, lines 124 to 131, and page 6, lines 1 to 8):

"The diaphragm may be of skin, parchment, wood, fiber, glass, board, or other desired material, because the method of operation of the device does not require the material to be magnetic, and almost any desired amount of power may be applied through the rotary cam."

"An iregular note may be produced by having the projections of the cam irregularly spaced, or by having them arranged eccentrically of the axis. Various concordant effects may be produced by regular spacing of regular groups. of cams about the periphery of the rotary member."

In letters patent No. 923,122, where the rotary cam alone is to be used, the patentee shows his idea of equivalents by specifying that he—

"may make the diaphragm of * * * any desired quality of elastic material, as, for instance, soft iron, spring steel, wood," etc.

Whether the driving instrument is a friction wheel or an electric motor, he recognizes and states the necessity of immediately throwing the parts into substantially full normal operation, and of stopping the revolutions of the cams without a gradual dying away of the sound. The patentee then sets forth a method of selection and arrangement of parts by which results may be obtained, illustrating what he has attempted to describe, and teaching any person endeavoring to embody the patent in a device how to manufacture the same. In so doing, he

enters into a disquisition or discussion of the phenomena produced or to be observed (page 7 of letters patent No. 923,049), and these statements are contained in this second patent in suit only.

The defendants contend that the patentee has thereby attempted to describe the functions or action of a device made up in accordance with one of the forms shown by the drawings and specifications, and that the claims of this second patent (as well as those of patents 1 and 3) are no more than a statement in concise form of the functions thus explained.

If this contention be correct, it is evident that the patentee could not obtain a valid patent for the mere statement in language of the physical phenomena observable by the operation and use of the different parts of the device (Marchand v. Emken, 132 U. S. 195, 10 Sup. Ct. 65, 33 L. Ed. 332), nor for the production of well-known results by the use of larger or different equivalents by means of which the phenomena may be more easily observed or satisfactorily analyzed (Planing Machine Co. v. Keith, 101 U. S. 479, 25 L. Ed. 939, American Road Machine Co. v. Pennock & Sharp Co., 164 U. S. 26, 17 Sup. Ct. 1, 41 L. Ed. 337, and Marchand v. Emken, supra).

Nor could a patentee obtain a valid patent under the guise of a "method" claim by describing such machine functions and stating that he claimed a patent for the result; i. e., the illustration of the phenomena described. Corning v. Burden, 56 U. S. (15 How.) 252, 14 L. Ed. 683. The mere use of the word "method" does not prove discovery of a new process or a useful and novel way of producing the desired results or functions through an original application of well-known principles, with well-known materials and well-known parts of different prior art devices and methods. Union Match Co. v. Diamond Match Co., 162 Fed. 148, 89 C. C. A. 172; Westinghouse v. Boyden Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136.

[1] The patentee has claimed in the present case devices to create a sound, and also the way or method of arranging and using the parts of the device to make it produce a sound of the sort desired. In so far as this result is a noise or signal, it is impossible to patent the noise itself; but, if that noise be produced by a patentable method, there would seem to be no reason why a valid method claim should not be included with the claims for the combinations of parts shown in the device. Risdon Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899, and cases cited; Leeds & Catlin v. Victor Talking Machine Co., 213 U. S. 318, 29 Sup. Ct. 495, 53 L. Ed. 805.

The defendants contend, rightly, that the production of a similar noise by another method or unequivalent devices would not be infringement; but the complainant may use the result produced as evidence of the occurrence of similar physical phenomena. If the instruments producing those phenomena are the same, it is a necessary conclusion that the methods of production are similar, and a valid method claim might be infringed, even when the product itself is unpatentable.

It is impossible to quote at length the statements of the patents which are involved in the contentions of both parties upon this question. They must, however, be considered in reaching the conclusion,

and must also be kept in mind in the subsequent discussion of the earlier patents.

The claims relating to the lubricating devices, the drainage arrangements, and a number of other claims stating mere refinements or alternative arrangement of parts that have nothing to do with the complainant's or defendants' device, might be quoted as illustrations of the patentee's thoroughness in description and industry in obtaining the issuance of a patent, in which a claim for every possible arrangement of specific parts might be distinguished from claims covering other arrangements. In other words, the patentee has included many specific claims, rather than a few general claims, and has introduced many of the mechanical equivalents in the form of definite description.

These claims have to be considered as a part of the patent in the study of its teachings and in interpreting its language. They have to be considered in connection with the prior art, but only those upon which infringement is charged in this action need be embodied in this opinion. They are claims 1, 2, 8, 12, 13, 22, and 30, for the wording of which reference must be had to the patent.

The third patent has been substantially described in connection with patent No. 1, and in the specifications (as has been indicated) many of the statements and propositions of the first and second patents are repeated. The invention of patent No. 3 is confined entirely to a device using the rotary motor described, or the rotary cam and diaphragm used in connection with such a motor. As in patent No. 2, there are a number of claims covering refinements or particular forms of device not shown in the commercial devices of either the complainant or defendants, and of use only in studying and testing the patentee's ideas and statements in connection with the prior art.

The claims relied on in this suit are 1, 2, 3, 4, 5, 6, 7, 8, 9, 13, 14, 15, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 35, 36, 37, 38, 45, 47, 48, 52, and 53, and will be quoted herein only by reference to the patent.

The development of the patentee's idea, with the selection and working out of the particular device which has proved successful on the market, indicates the difference between the patentee's idea of utility and salability of the invention and the successful commercial application thereof. That such an idea may be patentable, even though commercially nonsuccessful, until further development has occurred, or even until further invention has been devoted thereto, is shown by such cases as the Telephone Cases, 126 U. S. 1, 8 Sup. Ct. 778, 31 L. Ed. 863; and, on the other hand, knowledge of the principles of physics, such as are justly attributed to Von Helmholtz, would not prevent the patenting of a new device making use of or embodying those principles. In the present case the file wrapper shows that many of the ideas were developed and worked out, and the statements modified by cancellations and inclusions in the specifications and in the claims, during the time that the applications were pending in the Patent Office. The greatest industry and ingenuity were shown by the solicitors as well as the patentee, and many of the statements in the specifications, as

well as much of the language of the claims, is open to the criticism
that the results of experimentation and the production of phenomena
are described at the same time as the device or method used is being
explained, and it is difficult to separate what is patentable, or even to
carry in mind what is claimed as the invention itself.

The record in this case contains many hundred pages of testimony,
in which the statements of the patent, all physical phenomena describ-
ed or referred to by the patentee, and even by the witnesses, the dis-
closures of the prior art, and the accuracy of observation of both the
patentee and the witnesses are discussed. Both parties in their briefs
make assertions that certain contradictory propositions are true, and
that it is unnecessary to consider further differences which, during
the progress of the trial, compelled the taking of testimony in great
volume upon these particular points. Each counsel then proves his
point by referring to the voluminous testimony of the experts upon
these questions. In a number of instances, the premises from which
the experts drew their different conclusions have been questioned and
their conclusions contradicted. Hence it has been necessary to read
and consider all of the testimony to test the understanding, reliability,
and reasoning powers of the experts, and to learn what were observa-
tions of fact by them and what were matters of opinion.

The defense introduced an expert as a witness who entirely avoided
reading or considering the language or substance of the claims in suit.
His testimony deals entirely with the physical construction, capabili-
ties, and activities of the exhibits in the case, the principles of physics
involved and illustrated thereby, and discussion of prior art patents or
devices produced to illustrate them.

Another witness for the defendants testified only from the claims of
the patents in suit. He attempted an interpretation and classification
of the patents and of the devices of the prior art from the standpoint
of these claims.

The complainant used one witness, in rebuttal as well as in the
prima facie case, who covered both the phenomena and principles un-
der discussion, the patents of the prior art and in suit, and the ex-
hibits in the case, as classified or tested or read under the claims of
the patent in suit.

It is not necessary to state in detail the points of difference caused
by this division of labor on the part of the defendants' witnesses, nor
to discuss the matters in which the experts differed as to the explana-
tion of certain results, or disagreed in their observations and conclu-
sions from certain experiments and from the physical exhibits in the
case, as well as in stating the disclosures and embodiments of the paper
patents introduced as constituting the prior art. These matters have
to be borne in mind and weighed in connection with reaching conclu-
sions from the testimony and in forming opinions as to the facts prov-
en by the testimony. But it is impossible in an opinion to set forth
in detail all of the separate matters forming the basis of the general
result.

[2] As has been indicated above, the patents in suit describe certain
devices and methods of producing a characteristic sound. They con-

tain much argument or statement as to the way in which the alleged invention is demonstrated or illustrated by certain specific parts and forms of the device, and as to how the parts act. In spite of the inclusion of these other matters, certain apparently novel arrangements of parts, capable of producing the desired result and physically illustrating the principles involved in the production of such results, have been set forth and plainly involve invention, unless previously shown by earlier patents or by actual public use, when performing similar functions and teaching substantially the same application or use in the prior art. Mere possibility of a suggestion for further discovery or invention, like the unappreciated clue or idea shown by a sketch and not covered by any claim, is not anticipation. A. R. Mosler & Co. v. John Lurie, 209 Fed. 364, 126 C. C. A. 290.

It is evident that any sound might be used and in a sense be available as a signal. Certain sounds, principally because of their musical qualities, are of little use as *warning* signals, if the warning is to be conveyed by the sound, and not by a process of reasoning after the sound has drawn attention and observation. The warning signal, too, must be loud, and possess the other qualities discussed earlier in the opinion.

The construction of the patents in suit and the allowance of the various claims have been attacked upon the ground that the claims included in each of the three patents describe inconsistent and different constructions; in other words, that the patentee has included, in each of the patents, claims for a diaphragm actuated by a solid pitman or rod, with an eccentric and means to operate the eccentric at a high speed, and a diaphragm with a rotary driving member operated by an electric motor, and many descriptions of cases, oilers, drainage holes, and arrangement of friction drive or cam surfaces, in such a way as to make it evident that no one signaling device could make use of all the ideas claimed as invention in one structure.

It is evident that something like this suggestion led to the division in the Patent Office of the application for patent No. 1, but neither the patentee nor the Patent Office went so far as to completely separate the claims relating to the particular style of horn or signal, from the standpoint of the means of actuation, nor were the patents divided from the standpoint of means and methods.

Patent No. 1 contains claims 27, 29, and 37, describing the method of producing a signal, and also claims for a great number of devices, some of which actuate the diaphragm through a fixed connection with the pitman, while others actuate it by means of the cam surfaces. But if both are equivalent or exchangeable parts of one patentable device, and if each divided or separated part is patentable of itself, the claims would not seem to be necessarily void, nor the patent invalid. Leeds & Catlin v. Victor Talking Machine Co., supra; Hohman Co. v. Tagliabue Co. (C. C.) 175 Fed. 87.

The second patent describes *devices* alone, but has claims covering both the pitman and motor as actuating methods; while patent No. 3 describes only *devices* and only in connection with the use of an electric motor. No one of these claims is inconsistent with any other

claim, in the sense that it could not be used conjointly or in connection with all other claims of the same type of machine. Each set of claims as to an equivalent for some part is consistent with the other claims affecting the complete machine of the series or type to which the particular claim relates. In so far as every claim of any particular patent must of itself describe a patentable invention, regulations or statute might go so far as to require that every patentable claim of invention be presented separately, and thus compel the issuance of as many patents as the patentee can or must draw claims. But such a rule would be plainly impracticable, if not trivial, and the dividing line between this extreme and the other extreme, of combining inconsistent, separable inventions (or claims foreign to the device or machine which is described as embodying other claims of the same patent), cannot be discovered by any definite standard of interpretation until the other extreme is reached.

It is apparent that, with proper regulations and constructions, the Patent Office should not issue a patent for two entirely distinct inventions upon the same application and with the same grant of letters patent; but if a patentable invention—that is, a device or method—contains certain differing applications, patentable by themselves (yet actually forming a part of the general scheme or construction which is described as the comprehensive or main invention), then, not only the claims which are consistent with each other in one form of the device, but also all claims which are consistent with each other in the variation caused by a difference in type or difference in choice of some primary element (of itself the equivalent of some other primary element in the original device or complete patentable combination), may be included legally in one patent for the complete invention. If so issued with joinder of claims by the Patent Office, no invalidity is necessarily shown.

This may be carried back as far as the patent of the combination or as the patentable device comprises one general patentable embodiment of idea, and is not a mere aggregation of the parts or of separate inventions, in which no one general claim, applying to all forms of the device and covering every claim urged thereunder, can be found.

[3] The defendants recognize this proposition, but attempt to show the patents in suit to be invalid by contending that the only mechanical combination really shown by the claims is the mechanical vibration of a diaphragm with certain means or attendant devices used in earlier patents in the same way. They also contend that the mechanical vibration of a diaphragm, for the purpose of creating sound waves by the movement described, was old in the art when Hutchison filed his application.

It will be seen that this argument raises the principal question of the case. The patents as a whole are consistent, and can be supported, if the idea of the device generally, with the different equivalents or parts necessary for its actuation, was capable of being patented as a whole as a new invention by Hutchison. On the other hand, if Hutchison merely described certain ideas or devices old in the art, and, without suggesting or describing any new patentable use, arrangement, or

application of the devices, merely proceeded to string together, on the unpatentable structure, new combinations of various sorts to produce the same result, then, in so far as these new combinations did not of themselves show patentability, the claims would be invalid. Even though some of the combinations should show patentability, the general claims for the entire device and all method claims would be invalid, and the defendants' structures would have to be tested from the standpoint of infringement of the particular claim.

In this very way the defendants seek to show that, when narrowed to particular combinations or arrangements of parts, the Hutchison patents could not be read so as to include the defendants' devices, and these devices are said by the defendants to be rather those of the prior art, such as Pierman and Gieseler, which will be considered in that connection.

Passing by, therefore, the immediate determination of the various claims, from the standpoint of improvements or new combinations, we will take up the patents, instruments, and writings of the prior art, including those pleaded as anticipations.

The experts for both sides have enumerated seven different physical parts in the complainant's and defendants' commercial signaling devices. They have used this arrangement in construing the Hutchison patents, in comparing the complainant's horn with the claims of the patent or with the defendants' horn, and in comparing the defendants' horn with the patents of the prior art. These seven elements as stated by the complainant are:

(1) A small rotary motor requiring low voltage current.
(2) A cam wheel.
(3) A diaphragm.
(4) A contact or wear piece.
(5) A horn or resonator.
(6) A casing.
(7) Means for adjusting the position of the different parts.

The defendants' expert includes, in making up a similar list, the corresponding parts of the devices of the first and second Hutchison patents, and stating them in the same order he names:

(1) The actuating means (an electric motor or something else).
(2) Transmitting means (a rotary disk with cams or something else).
(3) An air-vibrating member (diaphragm or something else).
(4) Transmitting means (wear piece or some other member between the cam and the diaphragm).
(5) A horn or resonator.
(6) The casing.
(7) The adjusting means.

Both experts add as an eighth part, or as a general essential, the wires, switch, and battery for applying current. These the defendants' expert names as controlling means, in the sense that without the application of current, the driver of the machine could not operate the signal. But this use of the word "control" must be carefully distin-

guished from the so-called harmonizing or reciprocal adjustment of speeds and vibrations because of the amount of current load, the natural rate of vibration of the parts themselves and the interference caused by the relation of the parts with respect to one another.

The defendants allege that Hutchison specified the choice of "any suitable material" for his diaphragm, the use or omission of a horn, the possibility of using a horn of any shape, the use of a cam with surfaces of any shape (providing a direct thrust and allowing of an undisturbed or elastic return), the use of a casing or not, the possibility of adjustment so as to increase or decrease the load (from the point where the motor would not operate the cams to a point where the contact was so slight as to give insufficient vibration of the diaphragm), the choice of any size or thickness of the diaphragm, which would allow forcible displacement and elastic return, the use of a tight connection or a loose link, a friction drive or motor, a pitman operated by an eccentric, or by some other positive means. They argue, therefore, that he has in effect claimed but two ·essential elements, viz., some sort of a diaphragm, and something to cause the diaphragm to be displaced and vibrated or bent, and then caused to return in readiness for another blow. They go so far as to claim that Hutchison has attempted to patent a mere noise, and that he has not described or specified what noise, so long as it is a loud or disagreeable and startling noise. They claim that his commercial horn produces a loud, disagreeable, startling, or alarming noise, which is merely the effect upon the human ear of a repeated vibration of a metallic diaphragm at a substantially . predetermined speed, and hence that any similar rapid disturbance of a comparatively similarly sized metallic diaphragm must produce a similar noise. They argue from this that the Hutchison patent is invalid, as they assert that the vibration of a diaphragm, at a speed which could be substantially predetermined and caused by transmitted force through a rod or cam, was old in the art and has been shown by prior patents. They also assert that the use of the horn or resonator was well known or understood, and deny the novelty of control of the motor by the resonator and diaphragm.

In this way they allege that both the complainant and defendants are using old ideas, and that Hutchison has not described any patentable combination or new arrangement of parts. They say that Hutchison, or those developing the idea of his patent, at·a time prior to the final allowance of that patent, had merely succeeded in adapting one old form of mechanism for vibrating a diaphragm by hand or friction or by an electric motor; that his wear piece is but one form of various transmitting means shown in earlier patents; and that he and his solicitors, in attempting to describe the arrangement of the parts which he had assembled, and their physical movements and behavior when in operation, have done nothing more than to elaborately state the functions of the particular choice of parts which he saw fit to use, with the insertion of all the equivalents of which he could think, although all were old in the art, and that he then claimed as invention the conclusions of his study of this particular machine.

One further matter presented by the defendants must also be stated in anticipation of the consideration of the prior art. The complainant

has calculated and argued that arithmetic determination of the speed of vibration and of cam contacts proves its contention that various parts have a harmonizing or standardizing effect upon the rotation caused by the electric current, and the speed of vibration of the diaphragm under the influence of that current. They have shown that, beginning with 4 (or less) ordinary dry cells, the rate of vibration of the diaphragm and the note produced by the signaling device remain substantially constant until, by the addition of cells up to 10 or 12 in number, and the corresponding increase of current, a speed of 30,-ooo cam contacts per minute is produced. The increased amplitude of vibration, or the increased loudness of tone, or the increased work from more rapid and more frequent cam thrusts (whichever may be the actual result), does finally cause a jump in the note to the next harmonized or next substantially constant speed of vibration (which is at some note higher in the scale than the one just left), and that there again the note will remain substantially constant, even though a large increase of power be applied. They have shown, by braking a cam with some exterior object, that the load upon the motor can be increased until the cam contacts are so infrequent, at a slow rotation of the cams, as to give, for short intervals, substantially silent rotation. This is apparently caused by the free elastic vibration of the diaphragm, at such a rate as to synchronize with the interference of the cam contacts, so as to cause a skipping of the successive engagements, while the diaphragm is vibrating freely, but not rapidly enough, nor with sufficient amplitude, to make audible sound.

It would appear from this illustration that the load upon the motor must not be increased to a point where it will prevent the necessary rapidity of vibration of the diaphragm, and hence that adjustment, in the sense of measuring the propinquity and thrust of the contact surfaces, is necessary, and also that, if the amplitude of vibration remains substantially the same, increased speed, under additional power, will cause an additional number of cam contacts, without thereby changing the resultant vibration of the diaphragm and the production of tone, until the increase in the number of cam contacts causes a distinct increase in the resultant natural frequency of the diaphragm vibrations to the very next temporarily steady rate, and with sharp or sudden jumps from one rate of vibration to the other. This makes it possible to produce, by the quick application of reasonably constant power, a rate of rotation of motor, and a speedily formed, loud, and disagreeable sound, in connection with which there are sudden raisings and lowerings of pitch, with harsh overtones and breaks from silent speed to full resonance. Each change from one general rate of vibration to the next (higher or lower) is attended with similar discordant or harsh conflict of notes, all of which possess the qualities discussed earlier in this opinion, by giving a useful alarm signal where warning is intended.

The evidence shows a number of experiments and tests intended to demonstrate the truth or falsity of these claims. The defendants' expert has attached a mirror on either side of the center of the diaphragm of a so-called Pierman device, and by reflection of the beams of light upon a screen attempted to determine whether or not the parallel

beams from the two mirrors were deflected apart, when the diaphragm was pushed out by the cam contact. He argued that if, under the influence of the cam, the diaphragm were convexed at the center, the beams or rays of light would be thrown apart, whereas, if the diaphragm were merely bent or buckled by a sidewise thrust or scraping of the cam contact, bodily displacement, with free elastic return, would not be shown, but, on the contrary, either mere sounding board vibrations, or the tapping displacement or buckling, such as will be referred to under the Gould patent, would be indicated.

The complainant's expert had by the use of one mirror tried to prove with the Hutchison diaphragm the absence of tilting or buckling. But the defendants' testimony merely showed that the so-called Pierman device as offered in evidence did not buckle or tilt. The beams of light remained substantially parallel, or were deflected apart, and this would seem to indicate that the experiment was not carried out in such a way as to measure any flexing deflection, or that the flexing of the point or button did not produce much central flexing of the diaphragm, and probably little bodily displacement or free vibration.

We are left to the ordinary conclusion that, if the diaphragm be bodily displaced, it must have a bodily elastic return, whereas, if there is any tendency to twist or to buckle any diaphragm, there will be a tendency to reverse on the return, and in so far as this buckling or twisting of the diaphragm might produce sound it would increase the harsh or discordant effect of the signal, but has no bearing upon the question of invention or patentability of Hutchison's disclosure. If Hutchison's idea of causing bodily displacement of the diaphragm, with free elastic return, in a direction at right angles to the general plane of the diaphragm, and in the way described in the patent, was original with him, it is patentable over Pierman, which in that respect follows Gould, as will be shown later.

It should be borne in mind that a sounding board resonator, causing vibration of the atmosphere through ripples or waves transmitted from the surface of the sounding board, is entirely distinct from a plunger which moves (backward and forward) the air in front of its surface, and is also entirely distinct from what is known in the art as a diaphragm. This last is understood as meaning a surface which causes bodily displacement or movement of the body of air in front of the surface, while the perimeter or outer edge of the diaphragm remains in the same general position. A partial bending or displacement of the diaphragm may cause vibration of its surface, imparting to the atmosphere sound waves in the sounding board sense, while a plunger may impart forcible displacement, causing, in connection with the resonator, sound waves similar to those produced by the diaphragm.

But the three devices are not equivalents of one another in all ways in which they can be used. In the same way a horn, like a speaking trumpet, may have such arrangement of its sides and such curvature at the bell as to respond to any rate of vibration, and thus to intensify all tones of the voice. A megaphone with regular sides, upon an even slope, and without bell or longitudinal curvature, may intensify and direct the sound waves. An organ pipe may cause sound waves through vibrations set up by the movement of air within its length,

and will be a closed or open pipe, according to the point and manner of construction where the sound waves are set in motion. The nodes and loops of a closed or open pipe, and the acoustic length thereof, are matters settled by long study and experiment, and none of these ideas are of themselves patentable.

Hutchison specifies that a resonator may or may not be used, and experiments in the case show that different resonators have substantially no effect in changing the character of the tone (except as the load upon the motor assists in harmonizing), and that the difference between a speaking trumpet and megaphone or a straight tube as a resonator merely affects the carrying power, general penetrating qualities, increase of loudness to a certain extent, and the range of tones to which the resonator responds.

The use by Hutchison of a comparatively large diaphragm and of a resonator with a large mouthpiece opening removes from the structure the general magnifying character of the speaking trumpet or megaphone, that is, of the intensifying reflector, and gives to the resonator only the improving qualities of sharpness, direction, and somewhat better carrying ability, with a harmonizing effect in connection with the action of the diaphragm case and cams.

The presence of the resonator adds to the resultant restraining influences of the other parts of the device, increases the load upon the motor to such an extent that the resonator does have considerable effect in this harmonizing or standardizing of the diaphragm vibrations between the speed limits, and thus assists in establishing what have been called the different harmonics of the lowest audible tone of the instrument under full operation, or of increasing speed of the motor with increased power.

Among the other patents of the prior art, the Gould campaign rattle, No. 785,874, March 25, 1905, together with the watchman's rattle and the old device known as the Savart wheel, should be considered together.

The Savart wheel has been known for a very long period and described in many text-books under the subject of acoustics. A rotary toothed disk is made to strike or vibrate the edge of a card or metal plate held rigidly at the opposite end. When the rotation is slow, a series of audible and distinct taps is produced by the contact of the card with the approaching side of one tooth after the other. If the rotation be increased, so as to cause vibrations of the atmosphere at a sufficient rate to make a musical tone, a rising succession of notes is produced as the speed increases, and conversely, after the establishment of a standard, the speed of revolution can be estimated by the resultant tone. In the same way, the rising note or sound of a siren can be produced by the action of a jet of air upon the holes of a rapidly rotating disk, and a card so positioned that its corner will touch the perforated row of holes will produce a similar note to that caused by the jet of air.

The old watchman's rattle is based upon the idea of the Savart wheel, and produces a noise consisting of a succession of harsh taps or concussive sounds, by the striking of a springing finger or strip (firmly fixed at one end) upon the successive ridges or serrated surface of a

ratchet wheel, about which the member carrying the springing finger is revolved at such a distance as to let the end of the spring slip off from one ridge before the next one has reached the plane in which the springing finger normally rests.

The Gould campaign rattle provides for a flexible axis, upon which is mounted a metallic disk having a serrated edge. A tin diaphragm is so placed as to bring a ridge or projection turned up in its center against the serrated edge of the revolving member, and each tooth or point of this serrated edge, in slipping by the obstruction upon the face of the diaphragm, causes a displacement of the flexible axis, with the result of producing a sharp and harsh sound of contact when the next (or a succeeding) tooth comes in contact with the obstruction.

The action of the diaphragm would seem to be to some extent a displacement or a bending, and to some extent segmental vibration, under the effect of the tapping blow, as in the case of vibration imparted to a sounding board. The sound produced is intensified by the tin case surrounding the diaphragm and the revolving member and by a small horn with a flaring mouthpiece. But the instrument is not arranged for nor capable of rapid vibration, and no sound can be produced except the harsh tapping sound of the old watchman's rattle, intensified by the sounding board effect of the diaphragm, by the case and resonator.

In so far as the horns of the complainant and defendants locate their diaphragm near the front of the case, and in so far as the resonator and case, as well as the diaphragm, intensify the sound produced, the Gould campaign rattle is like the patent in suit. In so far, also, as the toothed member delivers the successive blows by rotation and by the contact of each tooth with the raised portion of the diaphragm, the Gould patent is like the Hutchison idea.

But there is no forcible positive displacement of the diaphragm, with a flexible and free return at a rate which will set in motion air waves, producing either harmonies or discordant musical notes, and the action of the different parts is in no way dependent, so far as the production or control of the sound is concerned, upon the relative effect of the construction and position of the different parts in controlling or harmonizing the vibrations, so as to cause a fairly definite and uniform sound immediately upon the actuation of the device, as in the case of Hutchison's patent with the rotary electric motor.

A careful effort to rotate the Gould campaign rattle as rapidly as possible will, for a very short space of time, produce a substantially steady, harsh sound, and of course this could be used as a signal for anything for which the particular sound was suitable and sufficient. But the Gould campaign rattle is nothing more than a combination of parts teaching a limited use of old devices in an instrument, commercially of some value, but evidently requiring more than the services of a mechanic before it can be changed to the Hutchison signal. If Hutchison were patenting a sound or noise, the Gould patent would perhaps serve somewhat of the purpose; but as a device it does not anticipate.

The Bapst & Falize patent, No. 384,412, of June 12, 1888, also patented in England on September 7, 1886, and in other countries,

applied the idea of the Savart wheel or the watchman's rattle in much the same way, so far as result is concerned, as that shown by the Gould patent, to an alarm clock in which a portion of the clock case is made to serve as a sounding board for a series of blows imparted by a toothed wheel set in motion by the clock mechanism and driven by a clock spring. The portion of the case used for this purpose is set in vibration by the springing distortion of a so-called point attached to a diaphragm, which is fastened around its perimeter in the case of the clock, and has a projecting horn or bell-shaped mouthpiece projecting therefrom. This point is sprung back and forth by a ratchet driven by the clock spring, and produces a series of transverse bendings or bucklings in the diaphragm, which are necessarily few in number. The point also strikes the succeeding teeth of the ratchet and gives the sounding board or tuning fork effect produced from the use of metallic parts, in a way similar to the Gould rattle, but with more musical tone. The spring or tapping is caused by bending of the diaphragm or the point, instead of by the yielding of the axis as in Gould, and this adds to the sounding board and tuning fork qualities of the instrument.

It is but a slight transition from Gould and Bapst & Falize to Pierman's British patent. This patent was issued under No. 13,495, upon the 26th of August, 1899, and is intended to provide a simple, easily attached, and loud-sounding alarm for general use, but especially for vehicles such as bicycles. It consists of the combination of a point (also called by Pierman a button) attached to a resonant diaphragm, in such position that this point or button is in contact with the transversely raised portions or corrugations upon a wheel, which can be brought by a spring lever or other attachment in contact with the bicycle tire or rotary member of the vehicle. The same corrugations with which the point of the diaphragm comes in contact cause sufficient friction to rotate the small wheel at a much higher rate of speed than the larger bicycle wheel, and thus a rapid vibration of the point and of the diaphragm is produced.

In the Pierman United States letters patent, No. 620,958, of March 14, 1899, as in the English patent, the diaphragm is shown inclosed in a case securely clamping the diaphragm around its perimeter and furnishing room for the vibration of the diaphragm between the sides of the case. A megaphone or horn is attached to the opening of the case, on the side of the diaphragm opposite to that carrying the point or button. The result is a more rapid vibration of the diaphragm, when the bicycle or other vehicle is moving at a fair rate of speed, than in the Bapst & Falize or the Gould campaign rattle. If the bicycle wheel could be made suddenly to revolve from slow movement to rapid movement, the Pierman device would cause a rising note, and, as illustrated by the exhibits in the case, produce a shrill, squeaky tone of no great volume. The difference between the rotation at low speed of the bicycle and at high speed is manifestly very great, the wear upon the rough surfaces and upon the tire of the bicycle is also manifestly great, and there is no evidence that the Pierman device has ever been commercially practicable, or that it served to more than teach that a rotary member, acting upon a point attached to a metallic

diaphragm, inclosed in a metallic case, operating at increasing rates of speed, will produce a note of rising pitch, like the note of the Savart wheel. This is caused, as in the Bapst & Falize, or in Gould, by segmental vibration of the diaphragm, and with incidental partial displacement of portions of the diaphragm, which undoubtedly increase its sounding board vibrations, while the tapping or snapping of the point adds vibration and sounds of its own.

Upon the final hearing of the case some testimony was produced by the inventor, Pierman, as to experiments with a fog signal or horn, in which, according to one of the witnesses, Pierman vibrated the diaphragm by means of a spring point fastened to the diaphragm and actuated by a ratchet or toothed wheel in contact with the outer end of the point. Pierman, however, testified that he used a phonograph diaphragm, and deflected it by a weight lifted by a trigger running over a ratchet wheel.

The testimony is that one device made by Pierman caused a vibration which, by some harmony of wave movement, put out a lamp whenever it was tested in Mr. Pierman's garret; and also that a diaphragm of large size, actuated in some manner, was tried as a fog device out of doors, but in particular was open to the objection that it did not indicate definitely the direction from which the sound came. These experiments did not, therefore, result in anything. The experiment was evidently abandoned, and would not be an anticipation of the Hutchison patent, even if some of Hutchison's ideas were temporarily working in Pierman's mind.

A most interesting prior art device is that of Wiegle, who did not attempt to take out a patent, but who lectured and exhibited models in Germany, and whose device has been reconstructed by the witness Carll, from an ordinary drumhead, with the skin of the drumhead reciprocated by a pitman rod driven by an eccentric, which in turn is rotated by any convenient application of power.

The Wiegle instrument is said, with a drumhead 40 centimeters in diameter, to produce a tone of quite extraordinary intensity, increasing in strength with the lengthening of the amplitude of vibration, and rising in tone with increased rapidity of vibration. Wiegle is said to have claimed that this so-called motorophon would far surpass every known mechanism for signaling or for a fog horn, as it could be "heard above the greatest storm, the loudest thunder, and the mightiest roar of the sea, and that, even in its present hand-actuated embodiment, the hearing is dangerously affected when it is not cautiously approached."

No such alarming consequences appear from the exhibit manufactured by Mr. Carll, and the Wiegle device as produced in court is substantially the application of power to a drumhead and pitman, to accomplish the same result as that shown by another illustration by the defendants on the argument. This latter illustration brings in the antiquity of the idea of vibrating a diaphragm to produce noise, in the form of a tin can actuated by a small boy applying some surface treated with rosin to a string, projecting through a hole in the bottom of the can and terminating in a knot upon the inner side of this hole.

That such vibration of the diaphragm will produce noise does not need argument, as every one has been familiar therewith, and Wiegle seems to have dignified this instrument of torture into an example of scientific and practical sound making, by producing the vibration of a tightly stretched diaphragm or membrane, with the rapid back and forth movement of the pitman, instead of the frictional pulling and slipping of the rosined string.

It is rather difficult to see how Hutchison can base any broad patentable idea upon his fixed pitman rod diaphragm vibration, except in the narrow sense that he provides for a positive forward and back displacement of the diaphragm surface, and thus moves the volume of air immediately in front of the diaphragm, in the same manner as would be caused by the operation of a plunger. But this is much like Wiegle's production of greater sound by causing greater amplitude of stroke.

When, however, we come to the loose link operation of the pitman or the cam drive, a different question is presented, and the Wiegle motorophon teaches only a practical application of the tin can "howler," as it has been called by defendants' counsel. Hutchison has included no claim for the fixed pitman or rod device, and the Patent Office evidently rejected such claims on the prior art.

The Gieseler German patent, No. 119,306, issued April 4, 1901, shows an application of the use of a closed resonator, or tuning fork vibrator, or siren device, available when means are desired to determine the rate, or to indicate the rate, at which revolution of some member is occurring. It is a speed indicator. The way in which Gieseler sought to secure this result was to describe a device from which sound audible to the normal ear would be produced only when the speed approached or reached the rate from which the indication was to be taken. He illustrates this use by referring to an ordinary cream separator, in which the skimmed milk will be thrown off by centrifugal effect, at the desired rate, or at the desired speed, when sound is produced by the impact of the small jets of milk.

In this German patent he has also a device with tuning fork attachment, by which a rotary cam, with evenly spaced sloping cam surfaces upon the outer edge or periphery of the rotary member, actuates a triangular shaped projection at one end of a spring firmly attached at its other extremity. The spring bears upon a small diaphragm across the end of the cylindrical resonator by means of an ovoid-shaped object like a small spherical pad under compression.

In his English patent, No. 21,084, of 1900, he describes a similar device, in which the pulsations are caused by a spring hammer tapping the diaphragm, or by a spring attached to a tuning fork. This hammer (or the spring) is actuated by a disk having a corrugated edge, located upon a rotating shaft, and the patent specifies that care be "taken that the spring is so arranged as not to produce a tone by its own vibrations."

The drawings of the English patent show the member, which in the German patent is in the form of a compressed sphere, as if it were a continuation through the spring of the triangular projection or ham-

mer head which contacts with the cam surface of the rotary member. But the testimony in the case indicates that such a hammer or tapping member would fracture the diaphragm, if the rotary member be revolved at high speed when close contact is maintained at all times, and, if not so arranged, the spring member becomes merely a tuning fork, while the diaphragm becomes the sounding board or drumhead, representing an entirely different device than the diaphragm of the Hutchison patent.

The Gieseler patent has been illustrated by several devices introduced in the case, and in one of them, called "Complainant's Exhibit Hammer—Gieseler Device No. 2," a soft rubber pad has been interposed between the spring and the diaphragm, and the spring is actuated by a rotary member with low-pitched cam surfaces, capable of adjustment so that they can cause vibration of the diaphragm at a rate corresponding to the pipe note of the cylindrical resonator. If this vibration is caused by a positive displacement of the diaphragm, with some elastic return, then certain conditions recognized by Hutchison, and also shown by Gould, are taught by the Gieseler patent. But there is nothing shown by which Gieseler stated, or from which a mechanic should have known, that a uniform and constant *signal*, at all speeds of rotation within the ordinary power of the motor, can be furnished by positive or bodily displacement of the diaphragm with free elastic return, when no resonator is furnished to pick up and sound the particular note corresponding to one speed of that vibration. The only suggestion is that some tuning fork note or extraneous tone might be caused, which is to be avoided.

In other illustrative exhibits offered as "Gieseler," the interposition of a hard body to act as a hammer, or the arrangement of parts to allow such movement of the metallic spring as to relieve the strain on the diaphragm caused by operation with close contact, result plainly in what Gieseler gives warning against, viz., the causing of audible sound by the spring itself, and we then have the tuning fork or Savart wheel type of Gieseler, which would not anticipate the Hutchison signal.

The complainant company has obtained the rights to the Pierman patents by assignment, and their license notices in evidence state that the instrument to which the license is attached is made under various patents, including those to Pierman. The right of the complainant to use the ideas of the Pierman patent in connection with the Hutchison patents does not diminish his right to sue an infringer. Nevertheless, if the anticipation of the Pierman patent had the effect of narrowing the Hutchison patents, or of making them merely improvement or combination patents based upon Pierman, the ascription to the Pierman patent would be taken into account with respect to the question of patentability of the broad claims of Hutchison, and as to the charge of infringement by the defendants of the Hutchison patents alone. As the Pierman patent does not anticipate, its ownership is immaterial.

An alleged prior use resulting in an application for patent, which was abandoned (serial No. 251,901, filed March 24, 1905, by A. L.

McMurtry) and never really went beyond the point of certain experiments, was shown by one McMurtry, who in the years between 1905 and 1907 was connected with an automobile supply or sales house and made experiments upon a signal alarm for automobiles. He is shown to have had one signal of the siren type and another signal generally illustrated by certain drawings introduced in evidence. This signal consisted of a horn or resonator, set into a case in which a diaphragm was fixed, with a spring arm resting against a rotary cam, which was driven by an electric motor. Midway of the length of the spring arm, which was firmly fastened at or toward the opposite end, was a bolt or rod fastened to the spring, and also to the middle of the diaphragm, in such a way as to impart the vibration of the spring to the diaphragm.

McMurtry testifies that he never succeeded in getting a device which could be relied upon to work in the same manner and to stay in workable condition for any length of time. He would seem under certain circumstances to have caused a vibration which made a noise in some ways like the complainant's device, or in some way to have transmitted the tuning fork, Savart wheel, or Gould vibrations to a sounding board diaphragm, with a forced movement each way. The experiments broke the diaphragm, and generally the device was unworkable, unless the cam be started by hand, if the spring were fastened firmly enough to actuate the diaphragm at all.

[4] Another witness identified one of McMurtry's devices as having a point attached to the diaphragm like the Bapst & Falize alarm clock; but no one seems to have learned from these experiments anything practical, nor anything in which invention was perceived, or possible invention carried to the point of public use. Mere experimentation in public, or in a public place, followed by no improvement upon the prior art, and ultimately abandoned, is not sufficient to defeat a subsequent invention upon which patent has been issued, and which has finally proven to be of commercial value, so that those who abandoned their unsuccessful experiments realized what they might have accomplished if they had themselves reached the point where the invention could have been patented by them.

In the same way, a defendant cannot defeat an otherwise valid patent by showing abandoned experiments, even though these might have (but as a matter of fact did not) progressed to the point of disclosing the patentable invention. The various discrepancies or conflicts in connection with the McMurtry device, as to dates, as to the amount of noise produced, and as to its location upon the automobile or its manner of actuation—that is, whether from a frictional contact or by an electric motor—need not be considered, as the entire matter is insufficient to serve as a defense.

A number of patents from the phonograph art and considerable testimony relating to the phonograph disk or cylinder have been put in the case and commented upon by the experts with respect to the contention of the defense that the irregular surface produced by the stylus of the recording instrument (and followed by the instrument delivering vibrations to the transmitter in the reproducing instrument) is in

reality and in effect a rotary member with surface cam projections. Each of these projections is said to be of itself a cam vibrating a diaphragm by an outward thrust to produce sound. In the first place, it is evident that the vibration of the diaphragm in the case of a phonograph is like the resonator of the speaking trumpet, in that any sound transmissible by vibrations must be exactly reproduced through vibrations of the diaphragm itself, whether these sounds involve bodily displacement of the diaphragm or merely transmission of varying vibrations from the sounding board or telephone transmitter. The result is not that which is described in the Hutchison patents, nor which can be defined as producing sound through the vibration of the air in front of the diaphragm by a to and fro positive displacement and free elastic return of that diaphragm under described conditions. The necessity in the phonograph or telephone of having the vibrations transmitted exactly to the diaphragm, without the possibility of any elastic or free secondary vibration, is of the greatest importance, and patents have been taken out to prevent any vibration due to elastic return or to elastic vibratory displacement, beyond the exact motion of the so-called cam surface. Overtones, or accompanying vibratory tones, and all other sounds which interfere with the exact reproduction of the sound which has been recorded, must be prevented in the phonograph. In the Hutchison device, vibrations which (if at a proper rate) would give a musical or commonplace note would not serve the purpose of a signal, and no device accomplishing merely the musical or exact reproduction result would anticipate the Hutchison patent. Nor could anticipation be claimed from the phonograph devices solely because they show some actuation of the diaphragm by a surface which can be called a cam.

In the same way the patents (such as Zizang, No. 415,990, of November 25, 1889, or Chalas, No. 874,792, of December 24, 1907) relating to magnetic vibrations of a diaphragm, or magnetic vibrations of an instrument actuating a diaphragm, and based only upon the old idea that, as in the phonograph, the diaphragm may be made to reproduce a noise, or may by opening and closing the circuit do the work of the Wiegle crank and eccentric, are not anticipations of the Hutchison patent.

Reference has been made to the reproduction of a sound by a piston or sliding valve, setting in motion a column of air in a pipe or resonator, and the principle of an organ pipe has been also used in illustration. The vibration of the column of air in an organ pipe is of itself a collateral matter, as to which discussion need not be had in this case, except in so far as the vibration of the air in front of the Hutchison diaphragm with a resonator is claimed to resemble the vibration caused by the movement of a piston, or by the letting in of air in an organ pipe, and the Hope-Jones patents, which have applied these ideas to the purpose of making loud notes in an organ, and also in making fog signals, etc.

Hope-Jones is shown by the record to have been an engineer and inventor, as well as a musician. He has taken out two British pat-

ents, No. 14,473 of 1896, and No. 2,677 of 1901. In the earlier patent he describes what he calls a "diaphone," consisting—

"of a valve moved in a periodic manner by a diaphragm or its equivalent and governed by the application of a resonator or other form of spring or regulator."

By the use of his valve, he discharges a stream of fluid, or a current of air, or a jet of steam, into his resonator or organ pipe. The valve is made to open and close with the changes in pressure of the fluid or vapor in the resonator, by the flexing or bending of a thin wall or diaphragm in the casing of the resonator, at a point where the resultant compression and expansion is greatest. The fluid or air or steam injected will, with a proper adjustment (size and length) of the resonator or organ pipe, produce a sound.

In describing a device which he calls Fig. 5, he shows a barrel valve, opened and closed by pressure in the resonator chamber, for repetition of the admission of steam, and says:

"This, of course, results in the admission of a series of puffs of steam, governed as to frequency by the sympathetic period of the resonator G, thus producing a musical note."

With respect to other devices he states that the repeated introductions of steam or other fluid—

"result in the production of a musical note practically governed in pitch by the length of the tube G."

It is apparent that the patent intends to provide for a certain number of operations of the valve, corresponding to the wave length produced in the column of air, whose vibration causes a tone "governed in pitch by the length of the tube." In the form of device using a diaphragm, no vibration of the diaphragm is planned, except that which the wave lengths of the column of air produce, and which are transmitted to the valve.

This patent would be no anticipation of Hutchison, even though the diaphragm or thin portion of the resonator wall might have some slight effect upon the vibrations of the column of air in the resonator.

In the later Hope-Jones patent, he refers to the use of an electric motor with an eccentric and a pitman arm, to operate for the production of musical tone a diaphragm or piston in an organ pipe. In one drawing, Fig. 7, he shows a sounding board clamped around its outer edge, and set in vibration by a rod reciprocated by a motor or engine. Hope-Jones says that this sounding board will transmit vibrations to the atmosphere in the "usual well-known manner," and is apparently describing a device like Wiegle, with a wooden sounding board, instead of the skin drumhead or diaphragm.

In so far as this device, or any other of this Hope-Jones patent, shows a method of transmitting vibrations to produce sound, it is not an anticipation of Hutchison.

He claims under this patent, however, a third function, which he describes as "so arranging matters (if desired) that the periodicity of the musical tone shall to a certain extent control and regulate the periodicity of the reciprocating engine"; and, referring to Fig. 5, he

illustrates one method of this government and control. He says that the column of air in the resonator will exert considerable influence upon the motion of the piston, and "must tend to make the said piston move at a periodicity that shall correspond, or almost correspond, with the natural periodicity of the resonator." He states that the action upon the piston is communicated to the engine, and in this way the periodicity of the engine is to a considerable extent "governed and controlled."

"From this it will be seen that, if the length of the column of air in the resonator $n$ be slightly increased, the action of the reciprocating engine will be slightly retarded, while, on the other hand, if the length of the resonator $n$ be reduced, the action of the reciprocating engine will be accelerated."

This seems to be a statement that the use of resonators of different lengths, producing different musical notes, and having different wave lengths, would have some effect upon the speed; in other words, that increased rate of vibration with a short resonator will require faster rotation of the engine, and presumably increase the load or cause more work.

But Hope-Jones shows no result or object produced by his "governing" or changing of speed, and it is not until we come to Hutchison's use of rotary electric motors, and to vibration of a diaphragm with small motive power and large results, that harmony of the vibrations by controlling speed will give some benefit and show a patentable idea. Hutchison's application of "harmonizing" for the maintenance of a rate of vibration, until the jump to a higher rate, is also not taught by Hope-Jones, and is not anticipated by him. In fact, Hope-Jones described a function of operation with a longer or shorter resonator in connection with an organ pipe, where a given note was to be produced, and claimed it in his patent as a part of the device for getting the right note.

There would seem to be patentable idea in Hutchison over anything taught by Hope-Jones, or by Hope-Jones as applied to the Wiegle form of operation. It follows, therefore, that none of the patents presented in the prior art have anticipated the ideas which Hutchison seems to have claimed in his patent, and those ideas as shown in the devices or methods described in the patent were patentable.

The complainant and defendants have presented a number of models which have been labeled as Gould, Pierman, Wiegle, Gieseler, and McMurtry illustrative exhibits, and much testimony has been devoted to the explanation and criticism of these various devices. It is sufficient to say, without analysis of this testimony, that the various devices have presented, either exactly or in an enlarged manner, certain ideas of the Pierman, Gieseler, and Gould patents, which, taken in connection with the patents themselves, have proved valuable and available as illustrations, even though in each device it is possible to point out where departure from the Pierman, Gieseler, or Gould patents, or the McMurtry and Wiegle disclosures, has occurred, and where, in making the reconstruction, the teachings of Hutchison or comparison with the Hutchison device has caused experimentation and

original application with the patentee's improvements, rather than simple enlargement of the structures of the earlier patents.

The shape and proportion of the diaphragm, the wear piece, and the corrugated surface in the so-called Pierman devices, the method of applying power in distinction from the variable attachment of the Pierman device itself to a bicycle wheel or other vehicle, with the variations and changes from Gould and Gieseler, all go to substantiate the contention of the complainant that the various exhibits, while instructive and illustrative, do not show that Pierman or Gieseler described in their patents any device illustrating and showing appreciation of the patentable ideas of Hutchison in the patents in suit.

Even if this illustration and embodiment of the Wiegle device and the description of the Wiegle motorophon, in connection with the other patents, be held sufficient to throw doubt upon any patentable invention by Hutchison, describing a device consisting of a diaphragm of metal or some other substance, with or without a resonator, and vibrated by a crank attached to an eccentric, to which power is supplied by a steam engine, by hand, or by motor, nevertheless, none of the issues in this case and none of the claims of the Hutchison patents of any proven practical value have to do with that single idea.

Claims 1, 9, 18, and 20 of letters patent No. 923,048 are not relied upon in this case, but are closely connected with the claims rejected by the Patent Office on the prior art, and greatly resemble the disclosures of Hope-Jones and the Wiegle disclosure in connection with a magnified throw of the actuating rod.

The Wiegle illustrative devices seem to indicate that Wiegle's ideas would not produce a positive displacement, but rather sectional vibrations, and most of the claims above mentioned might be distinguished on that ground.

The expert for the defendants has produced a model, which he calls the "Second Wiegle Device" or a "Hope-Jones Device," and in which the usual Klaxon diaphragm, horn, and case are attached to a pitman rotated by an eccentric and driven by the usual complainant's rotary motor. He compares this with a Hutchison device having but one cam projection upon the rotary disk. He finds similarity of sound produced, and therefore argues that his so-called application of Wiegle or the Hope-Jones method of vibrating a diaphragm or small sounding board, by a motor used in connection with Hope-Jones' other idea of affecting speed of actuation by lengthening or shortening the resonator, completely anticipates the Hutchison patents, and says that he sees no reason why such a device as he has called the "Small Wiegle or Hope-Jones Illustration" would not give a practical commercial automobile signal.

For the reasons previously stated in this opinion, it would seem that Wiegle did not disclose any such idea, nor one which could be merely applied by a mechanic in making a successful practical alarm signal. Nor does Hope-Jones disclose anything beyond at least the discarded claims of the Hutchison application, and Hope-Jones' idea of governing the vibration is apparently distinguishable from that of Hutchison.

It would follow, therefore, that a combination of Hope-Jones' applications to a Hutchison diaphragm, resonator, and motor does not prove that Hope-Jones either invented or disclosed any such use. The Hutchison claims would seem to be patentable over any such disclosure.

A question was reserved earlier in the opinion as to whether the use of the stiffening bar in the defendants' form of diaphragm made this a Gieseler or Pierman device, rather than an infringement of the Hutchison claims. As Gieseler and Pierman have been held not to anticipate, this question becomes material, and the conclusion from the whole matter would seem to be that, if the bar has any effect at all, it may render the tone somewhat more musical, and in that sense is like certain parts of the Gieseler and Pierman devices; but its presence does not affect the other elements covered by the Hutchison claims, and the use of this bar would not, therefore, allow the defendants to escape infringement by claiming to follow Gieseler and Pierman.

Claim 24 of letters patent No. 923,048 calls for "means actuated * * * adapted to cause bodily movement of said diaphragm," etc., in combination with other parts. This form of claim has been upheld in the Paper Bag Patent Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122, and in Hillard v. Fisher Book Typewriter Co., 159 Fed. 439, 86 C. C. A. 469. It describes a device or parts of the instruments, so shaped and arranged as to produce the result stated. It is not the statement of a function, as contended by the defendants.

As has been previously said, the claims in suit are not inconsistent, even though their number, detailed description, and perhaps unnecessary statement of small variations has made it more difficult to consider, classify, and compare them with the other patents, and to read them in connection with the testimony in the case.

If the disclosures of the specifications were carried into the various claims of more than one patent, the technical objection of "double patenting" might be well founded. But the claims of each patent are separate and distinct from the other patents, and the resemblances in drawings and text are the natural result of describing improvements, or of dividing an application and presenting claims for a specific part or device as a separate invention. Underwood v. Gerber, 149 U. S. 224, 13 Sup. Ct. 854, 37 L. Ed. 710; Miller v. Eagle, 151 U. S. 187, 14 Sup. Ct. 310, 38 L. Ed. 121.

It would seem unnecessary to go through the various claims of these patents, merely to classify them or to attempt to pick out particular ones, about which some further argument might be stated. None of them are in such broad language that they could not apply to or be read upon the commercial device of the so-called complainant's Klaxon or Klaxonet horns and the defendants' Newtone horns, or with the commercially useful and valuable forms of this kind of signaling apparatus.

The manner in which the case has been tried, and the presentation of the issues, together with the possibility of causing further litigation by an attempt to separate and comment upon the individual claims

that have been called in question, or to specify what structures might escape infringement, make it seem unnecessary to decide other than in a general way that the complainant has the right to employ the Hutchison patents in manufacturing the devices about which issue is raised in this case, and to control or prevent infringement of their claims.

[5] Upon the issues raised, the Hutchison patents and the claims relating thereto, both as to devices and as to a method of operation, seem to be valid. The defendants' devices are infringements, and the complainant may have a decree.